## SWARTZER V. GILLETT.

EQUITY—AGREEMENT.—The fixed and well-established rule of courts of equity is, that they will not lend their aid to enforce the execution of an · agreement made in defiance or contravention of law, nor will they interfere to rescind or annul it, if already executed. In such cases a court of equity leaves offending parties where it finds them, either party having a right to resist and avoid such agreement, if not executed.

(1 *Chand.* 207.)

APPEAL from the Circuit Court for *Fond du Lac* County.

This bill was filed in the circuit court for the county of Fond du Lac by the appellant, to procure to be annulled a conveyance of real estate by him to the appellee, upon the ground that the conveyance was made to compound a felony committed by the appellant, and alleging that the appellee was a party to such illegal act. The facts are' sufficiently detailed in the opinion of the court for an understanding of the case.

The court below dismissed the bill, and the cause came here on an appeal by the complainant.

*A. L. Williams*, for appellant.

*J. M. Gillett*, for appellee.

LARRABEE, J. The question upon which this cause must be decided is, was the conveyance of the lands, described in the bill, made with a view to the compounding of felony? Was· such the intention and end of the parties? If it was, there is an end of this cause ; for it is manifestly repugnant to the duty of every court of justice, to lend its aid to enforce or annul such a contract. The authorities upon this point are too numerous, and the doctrine too plain and well settled, to be even referred to.

In May, 1847, an indictment was found against *Swartzer*, the complainant, in the district court of Fond du Lac county, for forging the name of John Slaven upon a draft for the

Swartzer vs. Gillett.

sum of $159.68, and passing it to the defendant, *Gillett*.   In
October following, the complainant was arrested in Easton, in
Pennsylvania, by the sheriff of said county, and brought to
Fond du Lac.   The defendant accompanied them on their
journey, and, as far as the present inquiry is concerned,
it is immaterial in what capacity he acted.   He had repeatedly
declared, both before and after the arrest, that he should
endeavor to procure the complainant's lands as security or
payment for the money obtained on the' draft, together with
his costs and charges; and, according to the testimony of the
sheriff and Simmons, was willing, in the event of success, to
let the complainant go clear.   The obtaining the land as pay-
ment, seemed to be the main object of the defendant, and he
seemed entirely to disregard the means used; nor was the
complainant apparently less anxious to compound his felony
in this way.   He had admitted the forgery and the receipt of
the money from the defendant, and that he had wronged and
injured him.   Nowhere, either in the bill itself or in the
proofs, is this denied.   The bill alleges that defendant prom-
ised, if complainant conveyed his land, he would not appear
against him upon his trial; that it would be a settlement of
the whole matter, and complainant might return to Easton in
the fall.   The testimony of Clock, sustained by corroborating
circumstances, is conclusive as to this.   Frequent conversations
of this character were had between the parties on their
journey.   Within two days after their arrival in Fond du
Lac, the conveyance was made; and although there is no
proof that conversations of a like character were had at the
time the deed was executed, still, from the whole testimony
in the cause, there can be but little doubt but such induce-
ments were held out by defendant as part consideration of the
conveyance.   Should this court annul a contract—cancel a
deed—made under such circumstances?   Would a court of
equity enforce a similar contract, if executory?   Most cer-
tainly not.   It will not, then, annul a contract already

executed, especially where the parties are *in pari delicto*, unless in cases where public policy would be thereby promoted.

" The suppression of illegal contracts is far more likely, in general, to be accomplished, by leaving the parties without remedy against each other, and by thus introducing a preventive check, naturally connected with a want of confidence and a sole reliance upon personal honor." " The law leaves the parties to such a contract just as it found them. If either has sustained a loss by the bad faith of a *particeps criminis*, it is but a just infliction for a premediatated and deeply practiced fraud. He must not expect that a judicial tribunal will degrade itself by an exertion of its powers to shift the loss from one to the other, or to equalize the benefits or burthens which may have resulted from the violation of every principle of morals and of law." *Battle v. Coleman*, 4 Pet. 184.

" The rule, as now clearly settled, is, that where the contract grows immediately out of, or is connected with an illegal or immoral act, a court of justice will not lend its aid to enforce it ; and if the contract be *in part only* connected with the illegal transaction, and growing immediately out of it, though it in part be a new contract, it is equally tainted by it." 4 Wash. C. C. 297.

The conveyance in question, if made solely as a discharge of complainant's civil liability, would be valid if made in good faith, and with equal means of knowledge ; but it is strongly to be inferred, from all the facts in the cause, that this was not the whole consideration ; and although the inadequacy of price is not so great as to raise a presumption of fraud, still, as connected with other facts, I think no candid mind could fail to perceive that the conveyance was in part, at least, connected with a design to compound a felony.

At the time the deed was executed, although the complainant was in custody, yet the evidence is clear that he acted freely and voluntarily. He was allowed to work in an open field, and go to and from the town, unattended. Under such

circumstances it would be difficult to imply that he acted under any unlawful constraint, and I cannot see that the contract can in any way be avoided by duress. It was argued by the counsel for the complainant that the fact, that the defendant was deputy sheriff at the time of the arrest and until the arrival at Fond du Lac, should have much weight in raising a suspicion of fraud in obtaining the conveyance. It is undoubtedly true, that the law holds ministerial officers to a strict responsibility and prompt discharge of their duties; and a court of equity will set aside a contract, where official power is made the instrument of extortion. But in this case there was an acknowledged felony committed, and the complainant was in the immediate custody of the sheriff from the time of the arrest up to the time of arrival at Fond du Lac. There is no evidence that the defendant acted as deputy after the arrival; and, moreover, it is not to be presumed that the fact of his so acting had any influence beyond that of the fear of his appearing as a witness on the trial. This was apparently the motive which operated upon the complainant.

Under this view of the cause it does not become material to notice the other points raised in the argument. The whole cause presents unmistakable evidences of a settled design to violate the law. The pretended ignorance of *Swartzer* in indorsing the draft by his mark, and afterwards writing his name legibly both in German and English; the declarations of *Gillett* to the sheriff, and his repeated conversations with *Swartzer*, all show this design; and now the complainant, coming into a court of justice with all these evidences of moral turpitude, and asking its aid to relieve him from the consequences of his guilt, presents a cause which needs only to be stated to be decided.

The decree is affirmed, with costs.